**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Case No. 24-CR-0109(3) (DLF) |
| NORMAN MORRIS, | : | |
| | : | |
| *Defendant.* | : | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Norman Morris ("Morris"), by and through his undersigned counsel, respectfully submits his Memorandum in Aid of Sentencing.  Mr. Morris will come before the Court on February 18, 2026, for sentencing.  For the reasons set forth below, Mr. Morris respectfully request that the Court sentence him to 41 months of incarceration with credit for time served.

## OBJECTIONS TO THE PRESENTENCE REPORT

Mr. Morris and counsel have reviewed the Presentence Investigation Report ("PSR") prepared by U.S. Probation Officer Sherry Baker and noted several objections to the report.

## STATUTORY AND GUIDELINE ANALYSIS

The offense of conviction carries a maximum term of imprisonment of 20 years in prison along with a minimum of 3 years of supervised released and a fine of up to $1,000,000.00.

The PSR calculated the Guidelines as follows:

| | | |
|---|---|---|
| a) | Base offense level - U.S.S.G. § 2D1.1 | 30 |
| b) | Specific Offense Characteristic (gun) - U.S.S.G. § 2D1.1(b)(1) | 2 |
| c) | Adjustment for Obstruction of Justice - U.S.S.G. § 3C1.1 | 2 |

**Total offense level**                                                                    **34**

The PSR assesses Mr. Morris six criminal history points and computes his criminal history at category III, placing him in a guideline sentencing range of 188 - 235 months.  However, the PSR states that Mr. Morris qualifies as a career offender pursuant to U.S.S.G. § 4B1.1, thereby making his criminal history VI, resulting in a guideline sentencing range of 262 to 327 months. Because the offense of conviction has a maximum sentence of 240 months, the guideline sentence is also 240 months.  The PSR's calculation of the base offense level is based on a converted drug weight of 1,356.08 kg, corresponding to a base offense level of 30.

Mr. Morris objects to the drug weight calculation, his classification as a career offender and to the enhancements for possession of a weapon and obstruction of justice.

## I.       The PSR's Drug Weight Calculation Is Incorrect

The PSR calculates a converted drug weight of 1,356.08 kg.  This calculation is based on 38 ounces of PCP, 16.5 grams of fentanyl analogue, 0.5 grams of crack cocaine and 56 grams of methamphetamine.  PSR at ¶ 23.

Mr. Morris was charged in Count One of the indictment with participating in a PCP distribution conspiracy.  The indictment alleged the conspiracy ran from on or about April 2023 until April 2024.  The jury convicted him of Count One (conspiracy) only.

At trial, the government presented evidence that Mr. Morris knew and associated with his alleged coconspirators.  For example, the PSR states that

> On November 14, 2023, an undercover officer placed a PCP order with Codefendant Bennett to be purchased the following day.  That night, Defendant Morris and Codefendant Bennet were observed meeting outside Defendant Morris' home with Codefendant Langston following telephone contact between Codefendants Bennett and Langston, and Defendant Morris.  Codefendant Bennett sold 6 ounces of PCP, which was exchanged in front of Codefendant Morris' house, to the undercover officer the next day.

PSR at ¶ 12.  Notwithstanding the insinuations of this statement, the government presented no evidence at trial that Mr. Morris had any involvement in that PCP sale. *See* May 27, 2025 Tr. 74:9 – 77:10.  In fact, the evidence only demonstrates that Mr. Morris associated with Langston and Bennett on that date and, at most, was present with them – mere presence is not enough to show that he conspired with them.  The only evidence presented by the government suggesting that Mr. Morris may have been involved in the PCP conspiracy, was evidence of the February 27, 2024, call from Langston to Mr. Morris asking Mr. Morris to get "four little eights" from codefendant Sanker's house.  According to the PSR:

> On February 29, 2024, Defendant Morris and Codefendant Bennett drove to Codefendant Sanker's house, where Defendant Morris retrieved the PCP.  This was captured on home security system and jail calls confirmed that Defendant Morris had 32 ounces of PCP.

PSR at ¶ 17.  Assuming *arguendo* that the evidence established this to be true, Mr. Morris at the earliest became part of the PCP conspiracy on February 27, 2024.  Thus, Mr. Morris at most should be liable for the 32 ounces of PCP which equals 907 kilograms of converted drug weight.

The PSR further attributes drugs seized from Mr. Morris in November 2023, prior to his joining the conspiracy, when he was pulled over for speeding in Maryland as being relevant conduct for purpose of calculating the drug weight.  During that stop, police recovered 56 grams of methamphetamine, 10 grams of fentanyl and 0.5 grams of crack cocaine.  The PSR further assesses 6.5 grams of fentanyl from alleged sales by Mr. Morris.  These amounts should not be included in the drug weight.

> Guideline 1B1.3, states that:

> Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

(1)    (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant;

\* \* \*

*that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;*

U.SS.G. § 1B1.3 (emphasis added).

The PSR attributes to Mr. Morris controlled substances—methamphetamine, cocaine base, and fentanyl—seized during a separate arrest unrelated to the charged PCP conspiracy.  Here, it is evident that Mr. Morris joined the conspiracy, if at all, on February 27, 2024.  Thus, the drugs that were seized from him in November 2023 in Maryland, did not occur during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.  In sum, only the PCP that was purportedly collected by Mr. Morris after Langston's arrest (32 ounces) is relevant conduct.  Thirty-two ounces of PCP amounts to 907 kilograms of converted drug weight.  That converted drug weight corresponds to a base offense level of 28.  *See* U.S.S.G. § 2D1.1(c)(6).

## II.    Mr. Morris Is Not a Career Offender Because His Prior Convictions Should Not Be Counted

Guideline § 4B1.1(a) states:

A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1(a).

4

Guideline § 4A1.2(e) states that

> Any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted. Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period.

U.S.S.G. §4A1.2(e). Mr. Morris' prior convictions are from 2007 and 2008, both for drug distribution. He was released from custody for both convictions on January 23, 2009. As noted *supra,* Mr. Morris at the earliest possibly became part of the PCP conspiracy on February 27, 2024. The convictions, and release from confinement for both, occurred more than 15 years from the "commencement of the instant offense" and should not be counted towards his criminal history or for purposes of the Career Offender Guideline.

If the convictions are not counted, Mr. Morris has zero criminal history points and is eligible for an adjustment for zero-point offenders pursuant to U.S.S.G. § 4C1.1. Additionally, Mr. Morris participation in the conspiracy was extremely limited and he merits a further reduction of four points for being a minimal participant in the offense. *See* U.S.S.G. § 3B1.2. Thus, with an adjusted offense level of 22[1] and Criminal History Category of I, the guideline sentencing range is 41 – 51 months.

**III.    A Downward Variance Is Warranted Under 18 U.S.C. § 3553(a)**

Even assuming, *arguendo*, that Mr. Morris technically qualifies as a career offender under U.S.S.G. §4B1.1, a sentence within the resulting advisory range would be greater than necessary to satisfy the purposes of sentencing set forth in 18 U.S.C. §3553(a). The career-offender guideline, as applied here, substantially overstates both the seriousness of Mr. Morris' criminal history and the likelihood that he will reoffend, and it fails to reflect who he is today.

---

[1] Base offense level 28, minus 2 levels for being a zero-point offender, minus 4 levels for being a minimal participant, equals an adjusted offense level of 22.

A.    **The Age of the Predicate Convictions Undermines the Core Rationale of the Career-Offender Guideline**

Mr. Morris predicate convictions stem from conduct in 2006, nineteen years ago. He was released from custody on both cases on January 23, 2009.  The conduct underlying the instant offense took place in February 2024, over 15 years later. That extended period in the community matters – not as mitigation in the abstract, but because it directly undercuts the recidivist rationale on which the career offender guideline rests.

The career-offender guideline is premised on the assumption that defendants with qualifying prior convictions present a heightened risk of persistent criminal behavior. That assumption does not fit the facts here. A defendant who returns to the community and remains there for well over a decade without new qualifying convictions is not the archetypal "career" offender contemplated by §4B1.1.

Section 3553(a) requires the Court to impose a sentence that reflects the defendant's actual history and characteristics, not a stylized version of recidivism divorced from time and context. Treating Mr. Morris as though he engaged in continuous criminal activity from his earlier convictions through the present offense mischaracterizes the record and produces a sentence untethered from reality.

B.    **Automatic Placement in Criminal History Category VI Substantially Overstates Mr. Morris' Risk of Recidivism**

Application of the career-offender guideline automatically places Mr. Morris in Criminal History Category VI, the highest category available under the Guidelines. Category VI is reserved for defendants whose records reflect frequent, repeated, and recent criminal conduct.  That description does not apply here.

6

Mr. Morris' prior convictions are old, and his return to criminal conduct—while serious – occurred only after a lengthy period of reintegration into the community. The career-offender designation thus collapses meaningful distinctions between defendants with fundamentally different criminal trajectories and treats them as equally dangerous.  Such overstatement is inconsistent with §3553(a)'s requirement of individualized sentencing. A guideline that mechanically elevates a defendant to the most severe criminal history category, without regard to a 15-year interval in the community, risks imposing punishment greater than necessary to protect the public or deter future conduct.

**C.      A Lengthy Career-Offender Sentence Is Not Necessary to Achieve Deterrence or Protect the Public**

The government is likely to argue that the career-offender designation demonstrates that Mr. Morris poses a heightened danger to the community. The record does not support that conclusion.

A defendant who lived in the community for more than 15 years after release before engaging in the instant conduct does not present the same risk profile as a defendant who cycles repeatedly and rapidly through the criminal justice system. The marginal deterrent value of a sentence driven by the career-offender guideline is therefore limited.

A substantial but measured sentence – one that reflects the seriousness of the offense without resorting to the career-offender range – will adequately deter future conduct and protect the public while avoiding unnecessary incarceration.

### D.    A Sentence Below the Career-Offender Range Best Serves the Parsimony Principle

Section 3553(a)'s parsimony clause requires that the sentence be "sufficient, but not greater than necessary." That command has particular force where a guideline enhancement dramatically increases the advisory range based on stale criminal history.

Mr. Morris respectfully submits that the Court should consider the advisory range absent the career-offender enhancement, or at minimum impose a sentence substantially below the career-offender range. Such a sentence would:

- Reflect the seriousness of the instant offense;
- Account for Mr. Morris' prior convictions without exaggerating their present significance;
- Promote respect for the law;
- Provide just punishment; and
- Adequately deter future criminal conduct.

In short, it would satisfy §3553(a) without treating Mr. Morris as something he is not – a continuously dangerous, incorrigible offender.  Even if the career-offender guideline technically applies, its application here produces a sentencing range that overshoots the statutory purposes of sentencing. A downward variance is therefore warranted to ensure that the sentence imposed is fair, individualized, and no greater than necessary.

### IV.    The Firearm Enhancement Does Not Apply

The PSR states that:

On February 25, 2024, Codefendant Langston was in possession of a Glock handgun with a machine gun conversion switch and an extended magazine while he was in Defendant Morris' car.  Because [Co]Defendant Langston's possession of firearm was reasonably foreseeable to Defendant Morris, and it was within the scope and in furtherance of their jointly undertaken criminal activity (drug conspiracy), the base offense level is enhanced by two levels.

8

PSR at ¶ 30.  The PSR thus applies a two-level enhancement under USSG §2D1.1(b)(1) based on the alleged possession of a firearm by Langston.  The enhancement is applied via USSG §1B1.3(a)(1)(B) on the theory that the firearm possession was attributable to Mr. Morris as relevant conduct.  That enhancement is unsupported by the record and inconsistent with the Guidelines.

### A.    Legal Standard

Where, as here, the defendant did not personally possess a firearm, the government bears the burden of proving, by a preponderance of the evidence, that a coconspirator's firearm possession was within the scope of the jointly undertaken criminal activity; in furtherance of that activity, and reasonably foreseeable to the defendant. *See* U.S.S.G. §1B1.3(a)(1)(B).

Critically, the scope of jointly undertaken criminal activity is narrower than the scope of the conspiracy itself, and the Court must make individualized findings as to the defendant's agreement and expectations.

### B.    The PSR Fails to Establish That Firearm Possession Was Within the Scope of Mr. Morris' Jointly Undertaken Criminal Activity

The PSR appears to assume that because Mr. Morris and Langston were involved in the same conspiracy – and were present in the same vehicle – Langston's later-discovered firearm possession is automatically attributable to Mr. Morris. That assumption is legally incorrect.

The D.C. Circuit has held that jointly undertaken activity is not coextensive with conspiracy liability, and that sentencing courts must determine what the particular defendant

agreed to undertake, not what others later did. *See, e.g., United States v. Childress*, 58 F.3d 693, 722–23 (D.C. Cir. 1995) (Under this principle of conspiratorial liability, then, there are two substantive limitations on a defendant's responsibility for acts undertaken by co-conspirators: Those acts must be "in furtherance of" the same conspiracy to which the defendant has agreed, and they must be reasonably foreseeable to the defendant.)

Here, the PSR identifies no evidence that Mr. Morris agreed to participate in an armed drug operation, agreed that firearms would be possessed, or even knew that a firearm was present. Mere association or proximity is insufficient to establish scope under §1B1.3(a)(1)(B).

### C.    The Record Does Not Show That the Firearm Was Possessed "In Furtherance" of the Joint Activity

The PSR states only that Langston was later found to possess a firearm. It does not establish that: the firearm was present during the jointly undertaken conduct; the firearm was accessible; the firearm was used, displayed, or referenced; or the firearm facilitated or protected any drug activity.

The Guidelines require more than temporal or relational proximity. The enhancement applies only where there is a connection between the weapon and the offense. *See e.g.,* USSG §2D1.1 cmt. n.11(A). Absent evidence that the firearm actually furthered the jointly undertaken conduct, the enhancement cannot stand.

### D.    Langston's Firearm Possession Was Not Reasonably Foreseeable to Mr. Morris

Foreseeability under §1B1.3 must be based on specific, case-particular facts, not generalized assumptions about drug trafficking. The District of Columbia Circuit has rejected

firearm enhancements where the government relies on speculation or boilerplate assertions that "guns are tools of the trade."  In *United States v. Bagcho*, the Circuit vacated a §2D1.1(b)(1) enhancement where the defendant neither possessed the firearm nor could reasonably foresee its possession by others, emphasizing the need for evidence linking the defendant's knowledge or expectations to the weapon. *See Bagcho*, 923 F.3d 1131, 1138–40 (D.C. Cir. 2019).

Here, the PSR identifies no facts showing that Mr. Morris:

- knew of the firearm,
- observed it,
- discussed weapons,
- had prior involvement with armed activity, or
- engaged in conduct suggesting that firearm possession was foreseeable.

Foreseeability cannot be inferred solely from being in a vehicle with another person who later possessed a firearm.  The District of Columbia Circuit has explained that "there must be something more than mere presence at the scene of a criminal transaction. There must be some action, some word, or some conduct that links the individual to the [contraband]." *United States v. Pardo*, 636 F.2d 535, 549, (D.C. Cir. 1980).

### E.    The Government Has Not Met Its Burden

The enhancement rests on conclusory assertions, not evidence. The PSR does not make the individualized findings required by §1B1.3(a)(1)(B), nor does it supply facts sufficient to satisfy the government's burden as to scope, furtherance, or foreseeability.

Because the government has failed to establish that Langston's firearm possession was within the scope of Mr. Morris' jointly undertaken criminal activity, in furtherance of that activity, or reasonably foreseeable to him, the two-level enhancement under USSG §2D1.1(b)(1) must be stricken.  In the alternative, should the Court conclude that the enhancement technically

applies, Mr. Morris respectfully submits that it substantially overstates his culpability and warrants a corresponding downward variance under 18 U.S.C. §3553(a).

## V.    The Obstruction of Justice Enhancement Does Not Apply

The Presentence Report applies a two-level enhancement for obstruction of justice under USSG §3C1.1, based on the allegation that after Langston was arrested, Mr. Morris received and disposed of drugs. This enhancement is legally and factually unsupported and should be stricken.

### A.    Legal Standard

Section 3C1.1 applies only where the government proves, by a preponderance of the evidence, that the defendant willfully obstructed or attempted to obstruct the investigation, prosecution, or sentencing of the instant offense.

The enhancement is limited to conduct that is specifically intended to interfere with the administration of justice, not conduct that merely constitutes continuation of the underlying offense. The District of Columbia Circuit has noted that willful obstructive intent is required, and that sentencing courts must distinguish obstruction from ordinary criminal conduct. *See, e.g., United States v. Henry*, 557 F.3d 642, 647–48 (D.C. Cir. 2009).

### B.    Alleged Post-Arrest Drug Handling Is Substantive Offense Conduct, Not Obstruction

The PSR alleges that Mr. Morris received and disposed of drugs after Langston's arrest.  That conduct – while potentially relevant to offense conduct – does not constitute obstruction of justice within the meaning of §3C1.1.   Receiving or disposing of drugs reflects continuation or concealment of criminal activity, not an effort to obstruct a judicial

proceeding or law-enforcement investigation.  Applying §3C1.1 here would impermissibly collapse the distinction between substantive offense conduct and obstruction, resulting in double counting.

### C.    The Government Has Not Shown Willful Intent to Obstruct an Investigation or Prosecution

To apply §3C1.1, the government must show that the defendant acted with the specific purpose of obstructing justice, not merely that the conduct had the incidental effect of making law enforcement's job more difficult.  The District of Columbia Circuit has made clear that the enhancement applies only where the defendant consciously acts with the purpose of obstructing justice. *Henry*, 557 F.3d at 646–47.

Here, the PSR does not establish that Mr. Morris:  knew of an ongoing investigation beyond Langston's arrest; knew that law enforcement was seeking the drugs as evidence; or acted with the purpose of interfering with investigators or prosecutors.

Absent proof of knowledge plus intent, §3C1.1 does not apply.

### D.    The PSR Fails to Identify Any Actual or Attempted Interference With the Administration of Justice

The PSR does not identify how law enforcement was impeded or how the alleged conduct affected the investigation or prosecution of the offense.  Here, the record does not show actual or attempted interference with judicial or investigative processes, as opposed to generalized concealment.  Speculation that evidence disposal might have made the investigation more difficult is insufficient.

13

### E. Application of §3C1.1 Here Would Improperly Expand the Enhancement Beyond Its Intended Scope

True obstruction cases involve conduct such as:

- providing false statements under oath,
- tampering with witnesses or jurors, or
- directing others to lie to investigators.

This case involves none of those hallmarks. Expanding §3C1.1 to cover ordinary drug-conspiracy conduct would improperly transform the enhancement into a catch-all for post-arrest behavior, contrary to the Guidelines. Because the alleged conduct constitutes substantive offense behavior rather than a willful attempt to obstruct the investigation or prosecution of the instant offense, the two-level enhancement under USSG §3C1.1 should be stricken.

In the alternative, should the Court conclude that the enhancement technically applies, the defendant respectfully submits that it substantially overstates his culpability and warrants a corresponding downward variance under 18 U.S.C. §3553(a).

### V. The § 3553(a) Factors Strongly Favor The Requested Sentence

In imposing a sentence that is sufficient, but not greater than necessary, the court must look to the statutory factors listed in Section 3553(a). These factors include:

#### 1. Nature and circumstances of the offense and history and characteristics of the defendant

As the jury recognized, the offense of conviction is undoubtedly serious. However, Mr. Morris involvement in the conspiracy is limited to his conduct on February 27, 2024, and he should not be punished for the prior conduct of his co-defendants.

14

Mr. Morris, 44-years-old, was born in Cheverly, Maryland to the non-marital union of Norman Lionel Morris and Cassandra Morris.  His father, a carpenter, died from cancer in 2018.  Cassandra Morris, a retired real estate agent, is currently 72 years old and is wheelchair bound.  Prior to his arrest, Mr. Morris lived with his mother and was her primary caretaker.  Ricardo Brown, Ms. Morris' longtime partner, died in 2025.

Mr. Morris is a lifelong resident of Washington, DC and was raised in East Capitol Dwellings, as housing project in Southeast D.C.  His father was incarcerated for most of Mr. Morris' childhood, and he reappeared in his life when Mr. Morris was approximately 20 years old.  Thus, Mr. Morris did not have a stable father figure growing up and he struggled emotionally because of the lack of a relationship with his father.  Nevertheless, he does have close relationships with his mother.

He has three children from three relationships.  His oldest son, Norman Chapel is 15 years old and lived with Mr. Morris and Cassandra Morris.  The child's mother was murdered in 2014, and as a result, Mr. Morris has physical and legal custody.  Mr. Morris also has a four-year-old daughter, Kelani, who lives with her mother in Baltimore.  Finally, Mr. Morris's youngest child, three-year-old Matthew, lives with his mother in the District of Columbia.  He has maintained regular contact with his children.

Mr. Morris is in generally good health, but suffers from sickle cell anemia, a condition that can cause the sudden onset of strong episodes of pain, called pain crises, that occur because of blocked blood flow and often requires medical attention.  The disease can also cause swelling of hands and feet, frequent infections and vision problems.[2]

---

[2] *See https://www.mayoclinic.org/diseases-conditions/sickle-cell-anemia/symptoms-causes/syc-20355876* (Last accessed January 27, 2026).

Mr. Morris suffers from depression and is prescribed medication.  Prior to h is arrest, he voluntarily sought out mental health treatment, but was arrested before he could begin therapy.  With respect to substance abuse, Mr. Morris has abused both marijuana and Percocet. He is amenable to substance abuse treatment and counseling during his incarceration.

He did not graduate high school but received a general educational development diploma while incarcerated in 1998.  Mr. Morris also received HVAC and  refrigeration certificates in 2004.

Since his arrest for the instant case, he has expressed sincere remorse and maintained exemplary behavior while incarcerated.  The letters in support of Mr. Morris attest to the real person that he is:

- Cassandra Morris, Mr. Morris' mother, describes how she has "seen a real change in his mindset, character, and goals.  He has expressed deep remorse for his past actions and speaks often about wanting to provide for his family and rebuild his life in a positive way."  Shew also speaks to the impact Mr. Morris' incarceration has had on his son, Norman.

- Dorella Brown, Mr. Morris' sister, states that her "brother's presence at home would make a significant difference for our family. Our mother has been struggling to manage daily responsibilities and care for his son Norman, and I have been doing my best to support them both however it has become alot. Having my brother home would greatly lighten the emotional and physical load that falls on our family. Most importantly, his son/child/younger sibling needs him — not only for financial stability, but for emotional support, guidance, and a strong family connection."

16

- Darnell Morris, Mr. Morris' brother, states that he has "witnessed the real changes he has made during his time at CTF. In our conversations, he's opened up about his mistakes, the lessons he's learned, and his desire to be a better man for himself and for our family."

- Duane Morris, Mr. Morris' brother, states "Since he has been incarcerated, his family has faced serious financial hardship. His teenage son Norman Chapple is struggling not only emotionally, but also because the household is lacking the stability and support that his father provided. The family is trying to manage on limited income, and the stress has taken a toll on everyone—especially his son, whose behavior has worsened under these pressures.  My brother has always been the main provider for his home. Without his presence and daily involvement, the family is falling behind on basic needs. Bringing him home would relieve the financial strain and help give his son the structure and guidance he desperately needs."

- Norman Chapple, Mr. Morris's 15-year-old son, states "Even though I'm getting older, not having my dad around has been really hard. I've seen how much he has changed during his time away. When we talk, he tells me about the things he's learning, the mistakes he regrets, and how he wants to be better for me and our family. I can tell he's serious about changing his life.  I really need my dad. There are things I'm going through as I get older that I wish I had him here for — guidance, support, and just having him there to talk to. His absence has been difficult for me emotionally and having him home would make a real difference in my life.   I know he's ready to come back and be the father I need. I hope you will consider giving him the chance to come home to his family."

Mr. Morris' friends also write about his character, remorse and desire to be there for his children. *See* Exh. 1.  Additionally, while incarcerated, Mr. Morris has completed multiple courses designed to better himself and help him lead a law-abiding life.  For example, he participates in a debate class/competition through the D.C. Jail, where the instructors consider him a "thoughtful, hardworking, and respectful member of the team.  We believe that his dedication to civil discourse, and to improving himself, speaks volumes about his character." *See* Exhibit 2.

      **2.**      **Need for the sentence imposed**

In addition to considering the above factors, the Court is required to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2."  18 U.S.C. § 3553(a), Section 3553(a)(2) states that such purposes are: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

      **A.**      **Seriousness of the offense, respect for the law,
just punishment**

As noted earlier, the offense of conviction is serious.  However, Mr. Morris' decision to exercise his constitutional right to a jury trial does not evidence a disrespect for the law of the judicial process.  Rather, it demonstrates that he had faith in the system such that he was willing to put his liberty in its hands.

A sentence of 41 months requested by Mr. Morris is more than sufficient to reflect the seriousness of his offense, promote respect for the law and to impose just punishment on Mr. Morris.

**B & C.**      **Deterrence to criminal conduct and protection from further crimes**

The parsimony clause of § 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary." Mr. Morris is 44 years sold.  The sentence requested by the government, 240 months, ensures that he will remain incarcerated into his sixties. Mr. Morris realizes that his actions have consequences beyond him.  He will lose his freedom and family once again and has caused great harm and pain to his children, especially his 15-year-old son.  He now knows that he cannot continue to act as if he is alone because his actions affect others.  Under the government's recommendation, he will be over 60 years old when is he is released and will be on supervised release for several years.  As the Court is aware, recidivism rates decrease as defendants age.  At a time when he should be freely enjoying his family and his life, he will be in prison or under supervision.  He knows that he does not want to spend the rest of his life in prison and will do anything to live a law-abiding life in the future.

**D.**      **Provide treatment and training**

Mr. Morris has abused marijuana and Percocet.  He suffers from depression as a result of his incarceration and separation from family.  Mr. Morris is amenable to participate in substance abuse and mental health counseling during his incarceration.

**3 & 4.**      **Kinds of sentences available and the sentencing ranges established**

19

Statutorily, the offense of conviction carries a maximum sentence of 240 months, and a maximum $1,000,000 fine. If the Court accepts the PSR's guideline analysis and recommendation, Mr. Morris would be facing a guideline sentencing range of 240 months. If the Court were to credit Mr. Morris' analysis, he would be facing a guideline sentencing range of 41 – 51 months.

**5.    Need to avoid sentencing disparities**

Section 3553(a)(6) directs sentencing courts to avoid unwarranted sentencing disparities among similarly situated defendants.

Lamont Langston, whom the government has represented is the most culpable member and head of the conspiracy was sentenced to 138 months. Jamar Bennett, who made multiple sales of PCP to the undercover officer, was sentenced to 121 months. Kelvin Sanker, who stored the PCP at his house, was sentenced to 65 months. Thus, the requested sentence is in line with the sentences imposed on Mr. Morris' codefendants.

**OTHER FACTORS**

*Consideration of Credit for time served*

Title 18 U.S.C. § 3585(b) states that "[a] defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences – (1) *as a result of the offense for which the sentence was imposed*; …" Therefore, Mr. Morris respectfully requests that the Court apply credit for the entire time that he was in custody since April 17, 2024.

20

*BOP Designation*

Mr. Morris respectfully requests that the Court recommend that the BOP designate him to a facility as close to the District of Columbia as possible so that he can be close to family during his incarceration.

## CONCLUSION

For these reasons, Mr. Morris respectfully requests that the Court sentence him to 41 months.  In light of 18 U.S.C. § 3553(a) such a sentence is reasonable and sufficient and not greater than necessary.

Dated:  Washington, DC
      January 30, 2026             Respectfully submitted,

            **BALAREZO LAW**

            /s/ A. Eduardo Balarezo

By:   _____

            A. Eduardo Balarezo
            DC Bar # 462659
            400 Seventh Street, NW
            Suite 306
            Washington, DC  20004
            Tel. (202) 639-0999
            Fax. (202) 639-0899
            E-mail:  aeb@balarezolaw.com

            *Counsel for Norman Morris*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 30th day of January 2026, I caused a true and correct copy of the foregoing Defendant's Memorandum In Aid of Sentencing to be delivered via ECF to the Parties in this case.

/s/ A. Eduardo Balarezo

_____

A. Eduardo Balarezo